Good morning, Robert Green on behalf of the Lupin defendants in this case. I'd first like to acknowledge the court's hearing this matter on an expedited basis, and the Lupin defendants express gratitude for that. That said, this is a reasonably simple case. What we have here is a question of the entitlement to a patent term extension. And in this situation, the patent term extension was granted on one basis, and that was the prior approval, or the approval of Levaquin. Levaquin contains one active ingredient, levofloxacin. Prior to that approval, the same company had obtained approval of ofloxacin. Ofloxacin contains two active ingredients. The same active ingredient, levofloxacin, the S in the entromer, and its component. Just on that basis, why couldn't we, why wouldn't we reverse, I mean affirm, because this is the first marketing of levofloxacin, right? It's the first marketing of levofloxacin alone. That's the claimed invention? That's exactly what they've claimed, that's what they've defined, and it's the first time it's marketed. Why wouldn't that alone suffice to affirm? Both the patent office and the district court. With all due respect, Your Honor, that turns the inquiry on its head, because the issue is not what the patent claims at all. The prior approval was for the racemate. The prior approval was for the racemate? That's a different drug, is it not? It is not. There may be patentability issues associated with it, and we do not, and have not, challenged the patentability determination. That is a separate question. You'd have trouble with that, it's got tremendous unexpected results, right? You'd have trouble fighting that, so very wise, stick with your case. Yes, exactly. This Court has affirmed, and we have never challenged the validity of that patent. On the other hand, what we do challenge is the patent term extension, and it's a litmus inquiry, truly. The prior racemate contains two components, levofloxacin and its counterpart are an antimer. And there's no factual dispute that that's the case. Does it make a difference whether it's a racemic compound versus a racemic mixture? Not at all. In fact, most racemates are actually racemic compounds as opposed to mixtures. We don't believe that the record really clearly shows either. But does the compound have different pharmacological properties because of the presence, albeit in a, well, the presence of both of the enantiomers? Two answers to that, I would say. Your Honor, from the standpoint of a compound, it's simply an easy designation for the interaction of the enantiomers in the solid state. The fact is, the physiological activity is beside the point when it comes to the issue of the patent term extension. The statute is clear. It asks a simple question. Was that entity that is now described in this application as an active ingredient a component of that prior approved product? And that's the only inquiry. The statute does not go into an issue of interaction. It does not go into an issue of whether one's better than the other. And in fact, the statute even recognizes that you can have a prior approval where there's more than one active ingredient. Can you say anything about being a component? It says, is it the first marketing or use of the product, not a component of the product. And that's a big difference, isn't it? I'd submit that it's not a difference because this Court has already acknowledged in many, many occasions that when you're talking about the term product, this goes back to the 1989 Fison's decision. You're talking about the active ingredient. Entitlement to the patent term extension is a question of the active ingredient, not the product formulation. So I think we passed that back in 1989. Well, help us then, if we're going to discuss active ingredients, help us reconcile Glaxo and Pfizer. Let me also say, Your Honor, that to reconcile Glaxo and Pfizer is not the issue in this case. We do not need to have Glaxo and Pfizer reconcile in order for lupin to prevail. Isn't Glaxo the one that's right on the money, though, in terms of the same situation, an ester and assault in Photocure, and in this instance, the race mates? Not at all. In fact, the difference is extreme. In Glaxo, in Pfizer, and in Photocure, there are issues that deal with whether the active entity that's forming the basis for the patent term extension was a salt. Was it an ester? Was it a salt of a salt? Was it an ester of a salt? That is not this question at all. If you look, for example, at appendix page 2493, it shows That's all discussed in Pfizer. I'm asking why couldn't we draw a distinction between Glaxo and Pfizer based on the technology and say we're not dealing with esters and salts, we're dealing with race mates, that's Glaxo. Why couldn't I do that? It's not in the statutes, Your Honor. The statute deals with What about product? And I can read product, as I suggested right at the outset, to say this is the first time the product, levofloxacin, has been marketed. Again, I would go back to this Court's decision first in Fizon's. It says it's not an issue of product, it's an issue of the active ingredient. Now, what was in existence as of the time of the approval of the Hatch-Waxman Act? The FDA had a regulation as well that talked about active ingredients. And that regulation specifically defines an active ingredient as any component. Why do you have a definition for components if active ingredients by itself is enough? That regulation specifically says any component that is intended to furnish pharmacological activity goes on, but that's enough. That's really all we need for our present purposes. And that regulation is right on point in this case because the experts from the plaintiffs have fully acknowledged that when you're dealing with a race mate, there are two components that are present. In this instance, the R and the S enantiomer, levofloxacin being the S enantiomer. And I can point you to the Wendlandt Declaration by the plaintiff's expert in this case at 82492 that says, Ophloxacin is comprised of two components in equal amounts, namely the S enantiomer, levofloxacin, and the R enantiomer. There is no dispute. It's a component, it's present, and it was in the prior product. On that basis alone, there really is no factual dispute. The patent term extension was improperly granted, and it should be deemed to be invalid on that basis. Mr. Green, let me try and put this on a different track. Yes. I gather that there was no dispute that after the racemates were separated and it was determined that their levorotatory enantiomer was the active one and also didn't have the side effects. It still had to go through some FDA approval process, did it not? Indeed it did. And I'm trying to understand how you believe that despite the need for the approval process and the delays that are inherent in that process, and which are the basis for the patent term extension, nonetheless, in this particular case, for this particular product, that extension should be denied despite the need for the FDA approval? Your Honor, with all due respect, all FDA approvals require some amount of delay. But Congress did not choose to grant patent term extensions or allow patent term extensions for each and every time that there is a delay for a drug that goes through FDA approval. It was very specific. It talked in terms of the product and defined the product in terms of the active ingredient. In this instance, that active ingredient was present in the prior product and therefore the patent term extension should be denied. But the difference in the statute, they talk about salts and esters, not the entire compound. They talk in terms, well first they talk in terms of the product and then in terms of the ingredient. They go on to say it's not just that specific ingredient that can prohibit, it's not an entitlement issue, but that can prohibit a patent term extension from being granted. It can be a prior salt or ester of that same active ingredient. And that doesn't apply here? It does not apply in this instance. So what do we have here? We have an entire product. You're saying it's not a new product. Is that your argument? It is not a new product because you have to focus on the active ingredient. But it's treated as a new product by the FDA, and that's what I'm trying to understand. Although it's treated as a new product, you say as a matter of law it's an old product. Well, every new FDA approval essentially for an NDA is a new product. No, sometimes it's a new use. And I think the general consensus is that the statute is directed to new uses, not to new products. The rights that flow from the patent term extension are limited to new uses, but the entitlement to the patent term extension is strictly limited to a new active ingredient. What was the active ingredient of that prior product? The active ingredient of the prior product? The active ingredient. There were two at least. What was the active ingredient? The active ingredient in the prior product was the combination of the two enantiomers. So there was something. It's not this active ingredient, is it? It was something else. It was a combination of two things. It's not the active ingredient in this levofloxacin product, is it? It was a combination of two components, Your Honor, and each of those components had activity. It was the racemic compound that was approved. It was a racemic compound that was approved, which was recognized. And again, you can turn it. It was the racemic compound that was the active ingredient in floxacin. I think the record is clear that even the plaintiffs, experts in this case, acknowledge that the term ofloxacin, as shown in the package insert, shown with a plus minus, and the testimony and the declarations from their experts is that any medicinal chemist would know that that means it's racemic and that there are present two enantiomers. But it was that racemic compound that was the active ingredient, correct? No. I would respectfully dispute that, Your Honor. The active ingredient is known as ofloxacin, which in itself means that there are two active components present. And that's the expert testimony from— Two components, but the active ingredient is the racemate. No. Even under the FDA regulation— And the racemate has two components, but the law nowhere requires us to prohibit components of a prior product, does it? What it requires you to do is— Flaxo doesn't require that. Pfizer doesn't require that. Active ingredient doesn't require that. That's what you have to get us to do, though, however, is to break down active ingredients into their components, and any component of an active ingredient then becomes, under your interpretation, an active ingredient itself. Isn't that your argument? I mean, it's not just my position. It's also the FDA's regulation. It says you look at the term active ingredient, and you ask the question, what's the active component? And in this instance, there are two active components. And I also look back— But that's not the law. The law is active ingredient. You're adding to that the additional requirement of any components of active ingredients, right? No. What I'm adding is the definition that was in place at the time that Congress used the term active ingredient that was used by the FDA to define active ingredient. And that active ingredient is specifically defined as any component that provides pharmacological activity. And that was in place at the time that Hatch-Waxman was passed. So to the extent that there is an issue as to what one means by active ingredient, one should look to the FDA regulations, and the FDA regulations is very specific on that. It says you look at it on a component-by-component basis. And in fact, that's what this court said back in the Arnold Partnership case. It said, look at it from the standpoint of component-by-component or ingredient-by-ingredient, recognizing there's a distinction here. And in this instance, there is no dispute. And in response to one of the requests for admission, for example, in this case, and that appears at 1193 in the appendix, the plaintiffs acknowledged that in the prior litigation, about which this court is quite familiar, the plaintiffs agreed that levofloxacin is one of the two biologically active enantiomers present in ofloxacin. That satisfies the requirement for active ingredient. That satisfies the FDA's statutory or regulatory definition of active ingredient. And it certainly is the issue that should be addressed when determining if there's a patent or extension. I have a feeling the other part is going to rely on the same FDA definition in a moment and tell us it's a little different. Well, and let me also say that the FDA, when looking at the question of entitlement to the five-year exclusivity provision, has specifically spoken to the issue of prior approved racemates when there's a subsequently approved isolated enantiomer and says it doesn't qualify for the five-year exclusivity provision. So the FDA has looked at that and has recognized that you don't simply say this is a prior racemate and consequently that's the active ingredient and that's the end of the inquiry. Applying the FDA logic to this case reaches the inescapable conclusion that levofloxacin was present in ofloxacin and therefore there is no entitlement to the patent term extension. And this was in 1989, again, that the FDA in its federal register notice specifically addressed this question of entitlement to the five-year exclusivity period and specifically said that an isolated enantiomer of a previously approved racemate is not entitled to that five-year period of exclusivity. So to the extent that there is an issue dealing with whether you look to the underlying components or not, the FDA has done so already on the regulatory side of the point. I see my time is up. It is. Thank you, Mr. Green. Mr. Gutman. Thank you, Your Honor. Good morning and may it please the Court. Section 156A provides for extending the term of a patent that claims a product. So Judge Rader's early question about don't we look at what's claimed is correct. The product claimed in the 407 patent is substantially optically pure levofloxacin. It is also correct, as the panel has observed, that the first commercial approval of substantially optically pure levofloxacin was when Levaquin was approved, and it was the delay in that approval that occasioned the grant of the patent term extension. Reconcile Glaxo and Pfizer. Sure. Well, first let me say that I agree with my friend and also with the government as amicus here that this case does not turn on reconciling Glaxo and Pfizer. That may be the case in the next case you're going to hear this morning, but it isn't for us. But what Glaxo, Pfizer, and Photocure all have in common is that all three of them deal with the meaning of the including any salt or ester language in the statute. That doesn't apply to us. We aren't talking about salts or esters here. And there is no statutory language. Congress could have very easily written including any enantiomers of aracinate, but they didn't. They clearly did not do that. So it's a different category. Now, whether they're consistent or not, I mean, I could reconcile them. I could argue they're inconsistent. I mean, Glaxo involved the question of whether you get it is the one that's closer on point because it deals with a patent term extension. And the question was there, if you've already gotten regulatory approval of two salts of a common base molecule and you come in now with an ester of the same molecule, but you want because it's good orally and thought the others were just good IV, do you get that patent term extension? And the language including any salt or ester in that case was interpreted to say, yes, you can get the extension because the salts and the ester were not salts and esters of each other, even though they had a common bearing. In Pfizer, the issue was a very different context. There the question was not should this extension have been granted. And neither dealt with enantiomers. We can factually distinguish pretty easily, but we have said active ingredient means active moiety in one instance and does not mean it in the next. Correct. How do you reconcile that? That's the problem. Well, if they are truly in conflict, then I understand the law of this court and all appellate courts to be that the earlier panel decision is binding unless and until it is either reversed en banc or by the Supreme Court. Now, I believe because the Pfizer case arose in the context of what does it mean to extend the patent for infringement purposes, if the patent claims two different salts, only one of which was the subject of the regulatory delay, once you've extended the patent, does infringing the claim on the second salt still apply? And the answer was yes. So one can reconcile them. But if you can't reconcile them, then Glaxo is the one that would govern. But again, in our case, neither would make a difference. We meet both definitions. Is levofloxacin an active ingredient of the prior product? No. The prior product has a single active ingredient. That's what the FDA says. That's what the label says. The FDA says a product is the active ingredients contained therein. Well, yeah, means any component, but you need to read on where my friend stopped. Intended to furnish pharmacological activity or other direct effect. And if you instead turn to the active moiety definition, which is a little bit different because there it doesn't talk about intent, but what it says is responsible for the physiological or pharmacological action of the drug substance. Either definition, what's intended or what is in fact responsible, what is responsible for and intended to be responsible for the physiological and pharmacological action of ofloxacin, ofloxacin is ofloxacin itself, the racemate. It is the two enantiomers operating together. How do we know that? Well, first of all, it is what the government, Congress left the application of these standards to expert agencies and one point on which Glaxo and Pfizer agree, fortunately, is that those determinations are entitled to great deference. Both of those cases say great deference. So you've got the PTO making the call here and the PTO, by the way, the government, in their amicus brief, made the representation of fact, which we're entitled to rely on here, pages 13 and again 19 of their brief, that the standard that they actually applied in approving the patent term extension in this case was the active moiety standard, which, as I understand it, is the harder, the tougher of the two standards. So they say they applied that standard and we met it. But those determinations, by the PTO, in consultation with, under the MOU, the FDA are entitled to great deference. This Court has always said that. Second, and that was the basis, that was what Chief Judge Brown said in the decision below, it's also the case, as this Court has observed, that the patent term extension, like the patent itself, is entitled to a statutory presumption of validity. Therefore, they have to prove that it was wrong by clear and convincing evidence, which they didn't do. On a certain level, it's a failure of proof here. Mr. Green said that there's a distinction between our discussion of what is entitled to a distinction, an extension, and what is entitled to a patent. He says that those patentability requirements are different from the extension requirements. Of course, there's some truth to that, but does the patentability requirements inform greatly that extension? If, indeed, it was given a separate patent, is it a separate ingredient? Is it a separate product? I can imagine instances, fortunately not this one, where the answer might be no, it might be somehow patentable, some dramatic new use, for example, even though it had previously been approved. But that isn't our case. Here, the two actually do line up. I mean, in substance, what they're arguing here is just a new variation on the theme. They've found a new way to say what Milan said in the case we tried in West Virginia and won there that this court summarily affirmed, and what four other generics said in a case that we won on summary judgment where no appeal was taken, which is that levofloxacin and ofloxacin are really the same thing, because as a matter of definition, aracinate consists of its two enantiomers. But that's not the law. That isn't the law for the patent purposes, and it isn't for patent term extension. The PTO has an unbroken, consistent record of granting term extensions for an enantiomer that was previously approved as aracinate, where the aracinate was previously approved. So that's clearly not the position they're taking. And the FDA was considering... But when those extensions have been granted, haven't they all been in situations where the enantiomer was separately patented? Yes, exactly, Your Honor. That's the context in which it happened. There would be a patent. It's exactly our situation. There was a patent for aracinate, and that was approved for marketing by the FDA. Then there was a separate patent for the enantiomer. So in a hypothetical, in which the enantiomer was not separately patented, but was nonetheless separated eventually, after great effort perhaps, as we see here, and put separately through the FDA process, would your answer be the same in terms of entitlement to a separate extension? Well, I guess if it hadn't been patented, then there wouldn't be a patent claiming that product to extent. Perhaps I'm misunderstanding the hypothetical. Well, I'm trying to understand whether the original patent on the aracinate might nonetheless be subject to an extension based on the extra effort to separately obtain approval. Judge Newman, that's an interesting theory. I've never thought about that. I don't know whether that's doable. Well, I don't want to put you on the spot, but I am trying to understand the relationship between the patent and the FDA approval activity and the extension. Well, here it's coterminous. That is, they are one for one. You had an earlier patent on the aracinate, and again, apart from the deference to the agencies, we also put in an extensive and unrebutted factual record here that it is very different in its physiological and pharmacological effect from the optically pure isomer. But we had the separate 892 patent on ofloxacin, approval of floxacin, which had it as its active ingredient, and the FDA didn't identify in the label or the orange book, they didn't say floxacin had two active ingredients the way my friend does. They said they had one active ingredient, ofloxacin. There is then the subsequent, after great effort, invention of levofloxacin, the optically pure enantiomer, and that got its own patent, its own FDA approval, and responding to the question, Judge Newman, that you asked of my friend Mr. Green, they start over. They didn't get to piggyback on the efforts in getting the FDA approval for marketing of ofloxacin. They start from scratch. It is a new drug for purposes of getting FDA approval when you go in there with the single enantiomer, as they did. So there's no double counting here. They started over. They got credit for just that time in the patent extension. And again, both the FDA, which consulted pursuant to the memorandum of understanding, and the PTO determined that this was appropriate because, in fact, this was the first commercial marketing approval of the enantiomer. And the fact that the racemate had previously been approved, the PTO has always and consistently taken the position that that is not the same product, it is not the same active ingredient, it is not the same drug, it is not the same active moiety. And as I said, here we've got an unrebutted factual record on top of the agency action. To back that up, they did not come in. I mean, all they've done, these were summary judgment motions, all they did by way of a factual showing, having the clear and convincing burden, as they do, was to say, well, gee, a racemate consists of two enantiomers. Yes, we all understand. I'm a political science major. I understand that. That's the definition of the racemate, as opposed to the enantiomers. But that doesn't mean that the enantiomer had been previously approved for commercial marketing or that it was an active ingredient or enabled arrest. And I think the record is quite clear on that, and for them it is just fundamentally a failure to meet their burden of proof. The Court welcomes political science majors and even an occasional English lit major, too. Thank you, Judge Rader. That's very open-minded. And this political science major does appreciate it. If there are no further questions, I think I would conclude my argument. We believe that both on the deference standard to the determinations, the consistent determinations of the PTO in consultation with the FDA, and based on the unrebutted factual showing below, that these are fundamentally different drug products, active ingredients, active moieties, under any definition the judgment below should be affirmed. Thank you. Thank you, Mr. Governor. Mr. Green. Let me first respond to that last representation, that the FDA has always viewed these racemates and isolated enantiomers as being different. In 1989 in the Federal Register, it's cited in our brief, FDA notes that a single enantiomer of a previously approved racemate contains a previously approved active moiety. That's the FDA position. It's been that position since 1989. That's why they've denied the five-year exclusivity. With respect to the issue of clear and convincing evidence, counsel raises an interesting question. He refers to the presumption of validity. If you look at 282, actually, it talks about the patent being presumed valid. There's a separate section that deals with patent term extensions. It doesn't really say that. There is no statement in 282 about such a presumption of validity. Turning to the question of the scope of the claims and using that to define the product, again, what this does is it really does turn the process upside down, and that's not how the process has worked. If you look at the record in this case, there is no guidance to the FDA provided by the patent and trademark offices to the scope of the patent. They simply say there's a patent. Go tell us if the active ingredient in this product that is forming the basis for the patent term extension was previously approved. And that's what they do. They go back and they look at that earlier approved product. And I would respectfully refer the court to U.S. Patent 4911932, which has a very interesting dialogue in it and approved product which had three ingredients, allegedly. One was deemed to be a new ingredient, not previously approved. In fact, it's a white petrolatum. I think we typically refer to that as Vaseline. And in that instance, the FDA concluded that the petrolatum, in fact, was never approved as an active, but it was in that particular product. But at the end of the day, the last step in the process was the patent office took a look at the scope of the claim and determined that that claim did not cover that claimed product because it said nothing about white petrolatum. So in that instance, there was no patent term extension granted because the claim, when finally looked at at the end of the process, didn't cover the active ingredient. And that's exactly the way it worked here. If you look at the Memorandum of Understanding, that Memorandum of Understanding says that with respect to that determination of whether there was a prior approval for that active ingredient, that was left to the FDA. That's exactly what happened here. And the FDA came back and answered and specifically referred to Glaxo as the basis for forming that conclusion. It relied on an inappropriate application of Glaxo to find in that instance that there was no prior approval for levoflaxacin. So I submit there was no expertise in that determination. It was an improper construction by the FDA. And to the extent that there is any expertise by the FDA in determining the issue of looking at the prior racemic mixture to determine if, in fact, it had two separate active entities, active ingredients or active moieties, they have spoken directly to that. They did so in 1989. And they said you look to the components. And in looking at the components, they have denied for those last 20 years, 5-year exclusivity, the same logic applies in this case. Okay. Thank you, Mr. Green. Mr. Gutman, case is taken under submission.